UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

CENTURYTEL OF CHATHAM,          CIVIL ACTION NO. 09-1951
LLC, ET AL.

VERSUS                             JUDGE ROBERT G. JAMES

SPRINT COMMUNICATIONS        MAG.  JUDGE MARK HORNSBY
COMPANY, L.P.

## OPINION

This action was initiated by Plaintiffs CenturyTel of Chatham LLC; CenturyTel of North

Louisiana LLC; CenturyTel of East Louisiana, LLC; CenturyTel of Central Louisiana, LLC;

CenturyTel of Ringgold, LLC; CenturyTel of Southeast Louisiana, LLC; CenturyTel of Southwest

Louisiana, LLC; CenturyTel of Evangeline, LLC; CenturyTel of Missouri, LLC; Mebtel, Inc.;

CenturyTel of Idaho, Inc.; Gallatin River Communications, LLC; CenturyTel of Northwest

Louisiana, Inc.; CenturyTel of Lake Dallas, Inc.; CenturyTel of Port Aransas,  Inc.; CenturyTel of

San Marcos,  Inc.; Spectra Communications Group,  LLC; CenturyTel of Arkansas, Inc.; CenturyTel

of Mountain Home, Inc.; CenturyTel of Redfield, Inc.; CenturyTel of Northwest Arkansas, LLC;

CenturyTel of Central Arkansas, LLC; CenturyTel of South Arkansas, Inc.; CenturyTel of North

Mississippi, Inc.; Gulf Telephone Co.; CenturyTel of Alabama, LLC; CenturyTel of Adamsville,

Inc.; CenturyTel of Claiborne, Inc.; CenturyTel of Ooltewah Collegedale, Inc.; CenturyTel of Ohio,

Inc.; CenturyTel of Central Indiana, Inc.; CenturyTel of Odon, Inc.; CenturyTel of Michigan, Inc.;

CenturyTel of Upper Michigan, Inc.; CenturyTel of Northern Michigan, Inc.; CenturyTel Midwest

Michigan, Inc.; CenturyTel of Wisconsin,  LLC; Telephone USA of Wisconsin, LLC; CenturyTel

of Northern Wisconsin, LLC; CenturyTel of Northwest Wisconsin, LLC; CenturyTel of Central

Wisconsin, LLC; CenturyTel of Midwest Kendall, LLC; CenturyTel of Midwest Wisconsin, LLC; CenturyTel of Fairwater Brandon Alto, LLC; CenturyTel of Larsen-Readfield, LLC; CenturyTel of Forestville, LLC; CenturyTel of Monroe County, LLC; CenturyTel of Southern Wisconsin,  LLC; CenturyTel of Minnesota, Inc.; CenturyTel of Chester, Inc.; CenturyTel of Postville, Inc.; CenturyTel of Colorado,  Inc.; CenturyTel of Eagle, Inc.; CenturyTel of the Southwest, Inc.; CenturyTel of Gem State, Inc.; CenturyTel of Montana, Inc.;  CenturyTel of Wyoming, Inc.; CenturyTel of Oregon, Inc.; CenturyTel of Eastern Oregon, Inc.; CenturyTel of Washington, Inc.; CenturyTel of Cowiche, Inc.; and CenturyTel of Inter-Island, Inc., all of which are entities incorporated and doing business in various states as local exchange carriers.[1] (Plaintiffs will be referred to hereinafter as "CenturyLink").  CenturyLink brought this action against Defendant Sprint Communications Company, L.P. ("Sprint") to collect money damages, costs, and attorneys' fees based on Sprint's refusal to pay $8,755,402.46 to CenturyLink in access charges under the federal and state tariffed rates for the termination of voice over internet protocol traffic to CenturyLink's local exchange customers and subsequent use of self help to recoup amounts previously paid to CenturyLink.  Sprint responded by asserting counterclaims seeking a judicial declaration and other relief, including attorneys' fees. Sprint sought a declaration that it had no obligation to pay the federal and state tariff

---

[1]Title 47, United States Code, Section 153(32) defines "[t]he term 'local exchange carrier'" as "any person that is engaged in the provision of telephone exchange service or exchange access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service under section 332(c) of this title, except to the extent that the Commission finds that such service should be included in the definition of such term."

The CenturyLink entities are also "incumbent local exchange carriers" in that they provided telephone exchange access or services prior to enactment of the Telecommunications Act in 1996 (or are successors to entities who did) before the market was opened to competitive local exchange carriers.  However, this designation has no bearing on the issues in this case.

rates.  In the alternative, Sprint sought a declaration that, if the voice over internet protocol calls were telecommunications services, they were jurisdictionally interstate and compensable only at the federal tariff rate.

A bench trial was held in this matter on February 2-3, 2016.  The Court took the case under advisement.  The parties submitted initial post-trial briefs on March 24, 2016 [Doc. Nos. 206 & 207] and response briefs on April 7, 2016. [Doc. Nos. 208 & 209].

The Court hereby enters the following findings of fact and conclusions of law.  To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I.    FINDINGS OF FACT

Sprint is a limited partnership organized under the laws of the State of Delaware and with its principal place of business in Kansas.  Sprint acts as a telecommunications carrier providing telecommunications services as a common carrier[2] and as an interexchange carrier ("IXC").  It is Sprint's role as an IXC that is at issue in this case.  An IXC is "a telephone company that provides telephone toll service.  An [IXC] does not include commercial mobile radio service providers as defined by federal law."  47 C.F.R. § 64.4001(d).

During the relevant time period of August 2007 to October 2011 ("the Dispute Period"),

---

[2] "The term 'telecommunications service' means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153(53).  A "'common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy . . . ."  47 U.S.C. § 153(11).

Sprint delivered traffic or calls[3] originating from both TDM (time division multiplexing) and VoIP (voice over internet protocol) technology[4] to CenturyLink, which then transmitted and delivered the calls to end users on CenturyLink's local exchange networks.  The parties' dispute is limited to the VoIP-originated calls.[5]

Beginning in 2004, Sprint entered into wholesale contracts with various cable television companies to deliver (or "terminate") their customers' calls to telecommunications networks across the country, including CenturyLink's local exchange carriers ("LECs").  VoIP technology is commonly used by cable companies to provide voice services to their subscribers, so that they can make and receive calls.  Cable company subscribers make VoIP-originated calls by speaking into analog phones.  The phones convert their speech into data packets.  The phones are connected to internet protocol ("IP")-compatible multi-media terminal equipment ("MMT") at their locations.  The MMT sends the data packets out as IP.  Because there was IP and a data connection, cable

---

[3]The terms "traffic" and "calls" are used interchangeably.  Hereinafter the Court will use the term "calls."

[4]TDM (also known as circuit switched voice service) is the traditional type of digital telephone system which has a dedicated wire from the telephone jack directly to the telephone system's key service unit.  The TDM system uses physical switches to route calls.  The TDM switches and circuits carry only voice data.

With a VoIP telephone system, the handsets are not directly wired to the phone system, but are connected to the data network and use the same cable, jacks and switches that are used for a personal computer.  The VoIP system only uses local switches to jump on and off a network at each end (i.e., calls between a VoIP subscriber and non-subscriber are terminated to the public switched telephone network at the provider's location).  Unlike TDM, VoIP carries data packets in IP which contain both voice and other data services, such as e-mail, streaming a video on the Internet, or playing a game over the Internet.

[5]The only issue with the TDM-originated calls is that, as discussed *infra*, Sprint withheld payments to CenturyLink for these calls while recovering the amounts it deemed overpaid to CenturyLink for the VoIP-originated calls.

customers could obtain other services, including a do not disturb feature, caller ID on the subscriber's television screen, and the ability for incoming calls to ring on their home telephone and another designated telephone (e.g. cell phone) at the same time.  However, all of these additional services are available only at the subscriber's location, that is, for incoming calls.

In its role with the cable companies, Sprint converts the VoIP-originated calls to TDM using a soft switch, which is  a voice switch that has the ability to operate interiorly with an IP network and handle VoIP traffic and to also do a protocol conversion of that VoIP traffic to TDM.  Sprint then uses a trunk (the connection between two switches) to deliver the calls to CenturyLink and other LECs in TDM.

CenturyLink must then deliver the calls to the end users, its customers.  Sprint pays "access charges" or tariffed charges to CenturyLink for providing this so-called switched access services, i.e., delivering the voice calls to its subscribers/end users/customers.[6]  Sprint delivers both  local and long distance calls to CenturyLink.   Because CenturyLink had properly filed with the Federal Communications Commission ("FCC") one or more tariffs for the provision of interstate switched access service, its federal tariffs were legally binding during the Dispute Period.  Its state tariffs were also legally binding because CenturyLink had also filed one or more tariffs for the provision of intrastate switched access service with the respective state public utility commissions where the LECs operated.

The federal and state tariffs set the rates and terms for "terminating access service."  Tariffs

_____

[6]Throughout this litigation, the parties use multiple terms with the same meaning.  The use of these multiple terms makes understanding this process unnecessarily confusing for a lay person, but, at its most basic level, if a customer for whom Sprint acts as IXC calls a CenturyLink customer, Sprint must pay an access charge to CenturyLink to deliver the call.

generally specify certain information that the customer must provide to complete a request for service, so that it is possible for the carrier (that is, CenturyLink) to determine the tariff under which the carrier's facilities are provisioned and billed.  The information provided did not include the origination of the call.

During the Dispute Period, CenturyLink made no distinction based on the form in which calls originated.  Prior to January 2012, CenturyLink's Federal and State Access Tariffs did not require CenturyLink's customers to specify whether the calls originated in VoIP or any other format, and Sprint was charged the same rates for TDM- and VoIP-originated calls.  Sprint delivered calls to CenturyLink's LECs in TDM, regardless whether the calls originated in TDM or VoIP, and the calls came across the same facilities.  The VoIP-originated calls were thus in the same format as and intermingled with traditional TDM-originated calls.  Before July 2009, Sprint did not identify the portion of the traffic delivered to CenturyLink that originated in VoIP, and CenturyLink provided Sprint with industry-standard signaling and call detail information, which did not identify the format in which a call was originated.  The calls Sprint delivered to CenturyLink and which CenturyLink terminated to its subscribers during the Dispute Period used the same CenturyLink equipment and processes regardless of whether the call originated in TDM or VoIP.

CenturyLink billed Sprint the per minute access charges that are set forth in the Federal and State Access Tariffs for calls it delivered, including VoIP-originated calls.  Prior to August 2009, Sprint never provided CenturyLink with the exact or estimated minutes of VoIP-originated calls that it was delivering to CenturyLink for termination.  Instead, Sprint paid the federal and state access charges to CenturyLink, without dispute, for both TDM- and VoIP- originated calls.

Beginning in July 2009, as invoices came due for payment, Sprint filed written disputes with

CenturyLink for charges that Sprint calculated as associated with cable company calls that had originated in VoIP.  Sprint disputed the access charges assessed on VoIP-originated calls that Sprint delivered to CenturyLink customers ("the Disputed Calls").   For both the current period (August 2009) and the prior periods (August 2007-July 2009), Sprint refused to pay the tariffed rates and instead compensated CenturyLink at the rate of $.0007 per minute.  Sprint's initial dispute stated:

> This dispute informs you that a portion of the terminating traffic on which CENTURYTEL has assessed interstate and intrastate access charges were originated using Voice-over-Internet Protocol (VoIP traffic).  To date, although the FCC has asserted jurisdiction over VoIP services and has determined that information services are not subject to access, the FCC has not yet rendered a determination as to the applicable inter-carrier compensation for VoIP traffic.  Absent such a ruling, SprintNextel is willing to pay $.0007 (the only rate the FCC has established for a certain subset of information services)[7] for termination of VoIP services.  In order to recognize its objection to CENTURYTEL'S assessment of switched access charges on VoIP traffic for the past 24 month period 08/07 through 07/09, SprintNextel hereby files a dispute claim and demands a credit of $4,822,593.  This amount represents the differential between the rate of $.0007 and the access rates CENTURYTEL charged on VoIP traffic.

The $0.0007 rate amount was not listed in CenturyLink's Federal or State Access Tariffs, and CenturyLink did not agree or acquiesce to Sprint's payment of this rate for VoIP-originated calls and disputes the applicability of this rate.  Following the submission of the initial dispute, Sprint continued to use the same general language in its subsequent disputes.

In addition to filing its written dispute, Sprint unilaterally withheld payments due to CenturyLink in order to recover amounts paid to CenturyLink during the Dispute Period over the $.0007 per minute rate. The withheld amounts included amounts that Sprint calculated as associated with the Disputed Calls and billed on the Post-August 2009 Invoices and amounts that Sprint

---

[7]This is the rate the FCC had applied to local Internet Service Provider (ISP)-bound traffic.

calculated as having been billed and paid for Disputed Calls between August 2007 and July 2009 (the "Retroactive Dispute").[8]  Sprint's engineer reviewed calls during the month of February 2009 and used the VoIP-originated call information from that month to estimate the number of VoIP calls delivered to CenturyLink during the Retroactive Period and Sprint's alleged overpayment to CenturyLink based on those calls.  Sprint then applied its Retroactive Dispute against approved charges to reduce the amount remitted to CenturyLink in payment of Post-August 2009 Invoices, including amounts owed to CenturyLink for non-VoIP calls.  Sprint referred to its action as an "Account Payable Debit Balance."  Sprint continued this action for each CenturyLink billing account number until the amount of the Retroactive Dispute for that billing account number had been reduced to $0.  Thereafter, Sprint remitted amounts associated with its approved charges (the tariffed amounts for non-VoIP-originated calls and the .0007 rate for VoIP-originated calls) to CenturyLink.

CenturyLink's Federal and State Access Tariffs require ordering facilities.  Access Service Requests ("ASRs") are the industry standard form for ordering switched access.  Sprint submitted ASRs to CenturyLink coded to indicate that it was requesting the establishment of switched access, but did not indicate that the switched access would be used to deliver calls that originated in VoIP.  Sprint paid charges for the facilities ordered through ASRs, and through which some of the disputed calls were delivered by CenturyLink.

After July 2009, Sprint began identifying the portion of the traffic delivered to CenturyLink for termination that had originated in VoIP.  During the Dispute Period, Sprint continued to deliver

---

[8]Pursuant to Magistrate Judge Hornsby's ruling [Doc. No. 155], at trial Sprint was not required to establish a foundation for the charges paid in the February 2009 bill [Trial Exhibit 42, pp. 47-48, three far right columns (attached)].  Likewise, for the months of August 2009-October 2011, Sprint was not required to establish a  foundation.  For all amounts, Sprint provided testimony on a general overview of its calculation process.

VoIP-originated calls to CenturyLink, and CenturyLink continued to deliver those calls to end users.[9]

The amount of access charges on VoIP-originated traffic that Sprint disputed as of December 31, 2011, totaled $8,755,402.46 before late payment charges.  Sprint holds this entire amount.  If interstate access charges applied to the VoIP-originated traffic in dispute, then Sprint was a customer of switched access service under CenturyLink's Federal Tariffs when it delivered those calls.  Likewise, if intrastate access charges applied to the VoIP-originated traffic in dispute, then Sprint was a customer of switched access service under CenturyLink's State Tariffs when it delivered those calls.  Federal and State Access Tariffs impose late payment charges on customers who fail to timely pay, and those charges accrue on a daily basis.  As of February 2, 2016, the late payment charges totaled $3,805,343.00.

After January 1, 2012, CenturyLink has applied the dictates of the FCC's 2011 Comprehensive Reform Order and charges only interstate rates to Sprint for VoIP-originated calls. *See In the Matter of Connect America Fund*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 4554 (2011), available at https://apps.fcc.gov/edocs_public/attachmatch/FCC-11-161A1.pdf (the "Comprehensive Reform Order").  CenturyLink relies on Sprint to identify those calls since it still has no way to distinguish calls that are converted from VoIP to TDM from those who were in TDM to begin with.

---

[9]To mitigate damages, CenturyLink stopped accepting orders from Sprint for new and augmented facilities (switched access and interconnection facilities) after it was notified about the disputed calls in August 2009.

9

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1337 because CenturyLink's claims in Count I assert violations of the federal access tariffs  filed with the FCC and its claims in Count III assert violations of Section 201 of the Communications Act of 1934, 47 U.S.C. § 201.[10]  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over CenturyLink's claims in Count IV regarding violations of the intrastate access tariffs because these claims arise out of the same transactions and occurrences and are part of the same case or controversy as the federal law claims.

Likewise, the Court has subject matter jurisdiction over Count I of Sprint's counterclaims seeking a declaration regarding interstate access charges and VoIP traffic because those claims arise under the Constitution and laws of the United States, including the Supremacy Clause (art. VI, cl.2) and the Communications Act, 47 U.S.C. § 151, *et seq.*  The Court has jurisdiction over Count II for unlawful imposition of charges for interstate services and Count IV for recoupment of charges for VoIP calls pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § §§ 206 and 207 because they arise under and allege violations of the Communications Act and also seek relief under interstate access tariffs filed with the FCC.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over that portion of Sprint's Count I and all of Count III which assert that CenturyLink breached its state tariff obligations.[11]

---

[10]Count II was dismissed by this Court on January 25, 2011. [Doc. No. 37].

[11]Sprint's Counts V, VI, VII, and VIII were severed and transferred to the Northern District of Texas by the United States Panel on Multidistrict Litigation.  *See In re MTA Switched Access Charges Litigation,* Civ. No. 3:14-2587-D (MDL No. 2587).  The district judge recently

**B.** **The Tariff Claims**

CenturyLink asserts that Sprint violated the applicable Federal Access Tariffs (Count I) and State Access Tariffs (Count IV) by failing to pay the invoiced access charges. [Doc. No. 1]. Sprint makes corresponding counterclaims in its Counts I and III. In Count I, Sprint seeks a declaratory judgment that the Federal and State Access Tariffs did not apply to VoIP Calls between 2007 and January 1, 2012, and, alternatively, that the VoIP calls were jurisdictionally interstate and thus, compensable, if at all, at the interstate (Federal Access Tariff) rate. [Doc. No. 66]. In Count III, Sprint seeks a declaration that CenturyLink violated the applicable state laws by applying its State Access Tariffs to the VoIP calls and prays for a refund of all amounts over billed if Sprint is ultimately ordered to return withheld amounts to CenturyLink, plus interest, costs, and attorney's fees.

To prevail on each of its tariff counts, CenturyLink must prove (1) that it operated under tariffs properly filed with the FCC and state authorities, respectively, and (2) that it provided Sprint the services at issue in this case under those tariffs. *See Verizon New York Inc. v. Global NAPS, Inc.*, 463 F. Supp. 2d 330, 345 (E.D.N.Y. 2006) (federal); *Alliance Commc'ns Coop., Inc. v. Global Crossing Telecommc'ns, Inc.*, Civ. 06-4221, 2007 U.S. Dist. LEXIS 48091, at *12 (D. S.D. July 2, 2007) (state).[12]

---

dismissed the counterclaims pending there, but the case itself remains pending. At the time of trial, Sprint was seeking leave to take an interlocutory appeal of the dismissal of its claims.

[12]If the Federal and State Access Tariffs applied to the VoIP-originated traffic that Sprint delivered to CenturyLink, then, under the filed rate doctrine, this Court is bound to enforce the terms of the tariffs. *Texas Commercial Energy v. TXU Energy, Inc.,* 413 F.3d 503, 508 (5th Cir. 2005).

The parties stipulated that CenturyLink operated under Federal Access Tariffs filed with the FCC and under State Access Tariffs filed with applicable state authorities, so CenturyLink has met the required showing on the first element. [Doc. No. 181, ¶¶ 11, 12, & 16].  The parties dispute the second element of the claims: whether the Federal and State Access Tariffs applied to the VoIP-originated traffic that Sprint delivered to CenturyLink.

During the Dispute Period, CenturyLink's Federal and State Access Tariffs made no distinction between TDM- and VoIP-originated calls, Sprint delivered the calls to CenturyLink in TDM, the VoIP and TDM calls were intermingled, and prior to August 2009, the calls were, in effect, indistinguishable to CenturyLink.  Under the facts, CenturyLink contends that its access charge applied.  Additionally, CenturyLink contends that Sprint issued ASRs to CenturyLink for switched access facilities that were used to deliver some of these calls, and they are presumed to receive what they ordered under the tariffs pursuant to the constructive ordering doctrine.  Finally, if the access charges were properly invoiced to Sprint, the Court cannot change the rates set forth in the Federal and State Access Tariffs under the filed rate doctrine, but must apply the rates filed with the FCC and state authorities.

Sprint contends that it provided net protocol information services, not telecommunications services, for VoIP-originated calls and, thus, CenturyLink's Federal and State Access Tariffs for per-minute usage did not apply.  If the tariffs did not apply, then the per-minute usage charges could not be invoiced, and neither the filed rate or constructive ordering doctrine is applicable.  Sprint further contends that it was not required to prove the exact amount of over billing, but need only make a reasonable estimate, which it did.  In the alternative, if the Court finds the VoIP-originated calls were telecommunications services, Sprint contends that they were jurisdictionally interstate and subject

to billing only at interstate/federal rates.

### 1. Whether Federal Access Charges Are Due

The FCC has not expressly answered whether Federal Access Tariffs applied to VoIP-originated traffic before 2012.  In its 2011 Comprehensive Reform Order, the FCC declined to make retroactive changes to the rates governing inter-carrier compensation for VoIP-originated calls.  Thus, the FCC left the pre-existing regulatory scheme in place.  The Court must, therefore, determine whether federal access charges are due under the prior scheme.

Until 1996, LECs historically held monopolies over the provision of local telephone service.  *See generally AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371 (1999).  The IXCs (the long-distance carriers) would deliver calls between LECs, generally over Feature Group D facilities, which is the trunk that is used as the interconnection between carriers.  For example, when an end user in Louisiana called an end user in California, the calling party's LEC in Louisiana would route the call to an IXC selected by the end user, which in turn would route the call to the appropriate LEC in California for "termination" to the called party. As part of this last step, the IXC would pay the LEC in California an "access charge" to compensate the LEC for the termination service.  *See In re IntaMTA,* 2015 WL 725948, at *2.

In 1996, Congress ended the local monopoly system by passing the Telecommunications Act.  *See generally AT&T Corp. v. Iowa Utilities Board*, 525 U.S. at 371; *In re IntaMTA,* 2015 WL 725948, at *2, 4-5. Among other changes, the 1996 Telecommunications Act obligated incumbent LECs to share their networks with new, competing LECs.  *See* 47 U.S.C. § 251(c)(2)(A) (imposing on LECs a "duty to provide . . . interconnection with the [LEC]'s network . . . for the transmission and routing of telephone exchange service and exchange access").  However, even after the

13

Telecommunications Act, some key aspects of the regulatory regime remained in place, including the access charge regime—whereby LECs continued to have the right to charge IXCs or information services providers access charges for providing access services[13]—unless and until the regime was superseded by the FCC.  47 U.S.C. § 251(g)[14]; *see also  In re IntaMTA,* 2015 WL 725948, at *4-5. That is, an IXC or information services provider was obligated to pay access charges to LECs which provided "exchange access, information access, [or] exchange services."  *Id.*

The proper methodology for addressing this issue under § 251(g) is to review the baseline practice in 1996 and then determine whether that practice has been superseded. *In re IntraMTA*, 2015 WL 7252948, at *11.  If an IXC's delivery of VoIP-originated traffic to a LEC for termination would not have qualified for access charges before February 8, 1996, then Sprint's delivery of such calls to CenturyLink also would not have been subject to access charges after that date. Even if access

---

[13]An "access service" is defined as "service and facilities provided for the origination or termination of any interstate or foreign telecommunication."  47 C.F.R. § 69.29b)(1996) *quoted in In re IntaMTA,* 2015 WL 725948, at *4.

[14]In full, Section 251(g) of the Telecommunications Act provides:

On and after [February 8, 1996], each [LEC], to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to [IXCs] and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding [February 8, 1996], under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after   [February 8, 1996].  During the period beginning on [February 8, 1996], and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

47 U.S.C. § 251(g).

charges applied before February 8, 1996, Sprint's delivery of calls to CenturyLink would still be exempt from the access charge regime, if the FCC prescribed regulations after that date which "explicitly superseded" the preexisting regime.

It is clear that the FCC did not explicitly supersede the access charge regime until the 2011 Comprehensive Reform Order.  In the 752-page Comprehensive Reform Order issued in late 2011, the FCC comprehensively reformed and modernized its universal service and intercarrier compensation systems.  As part of that reform, the FCC clarified that VoIP-originated traffic would thereafter be subject to access charges only at interstate rates. *See Order, Sprint Commc'ns Co. v. Berntsen*, Case 4:11-cv-183, at \*12 (S.D. Iowa) (filed Dec. 30, 2015) (Trial Exhibit 124).  However, this order only applies prospectively, not retroactively.

Thus, the Court must determine whether an IXC's (Sprint's) delivery of VoIP-originated traffic to a LEC (CenturyLink) for termination would have qualified for federal access charges before February 8, 1996.

Sprint argues that the Court must determine whether the calls were "information services or telecommunications services" and that if, as it contends, the calls were information services, the rates did not apply.  *Sprint Commc'ns Co., L.P. v. Jacobs*, 798 F.3d 705, 708 (8th Cir. 2015).  CenturyLink contends that the calls were telecommunications services, but that, regardless of classification, they were subject to the access charges.

The Court need not reach the determination as to the classification of the calls.  Although the FCC has not previously classified VoIP as telecommunications services, during the 2011 rulemaking, it "reject[ed] the claim that intercarrier compensation for VoIPPSTN traffic is categorically excluded from section 251(g)."  Comprehensive Reform Order, ¶ 956 n. 1952.  The FCC explained

that—regardless of whether VoIP-originated traffic is considered to be an "information service"—such traffic was still subject to access charges before 1996:

> Regardless of whether particular VoIP services are telecommunications services or information services, there are pre-1996 Act obligations regarding LECs' compensation for the provision of exchange access to an IXC or information service provider. Indeed, the Commission has already found that toll telecommunications services transmitted (although not originated or terminated) in IP were subject to the access charge regime, and the same would be true to the extent that telecommunications services originated or terminated in IP.

Comprehensive Reform Order, ¶ 957 (citations and quotations omitted and emphasis added); *see also id.* at n. 1955 ("Interexchange VoIP-PSTN traffic is subject to the access regime regardless of whether the underlying communication contained information-service elements."); *See Sprint Commc'ns Co. v. Berntsen*, No. 11-CV-183-JAJ, 2015 WL 9914589, at * (". . . all parties concede the facts necessary to classify Sprint as an [IXC]: they agree that Sprint received traffic from one telephone exchange and transported it to a different exchange.  Sprint argues that it was an 'information services provider,' because the traffic it carried came from an information service.  Addressing that question is unnecessary. Using either classification, 251(g) applied to the traffic at issue here.").

   This finding is consistent with the regulatory policy the FCC expressed in its Comprehensive Reform Order.  In that Order, the FCC set forth a "transitional framework for VoIP intercarrier compensation." Comp. Reform Order ¶ 40. Effective January 1, 2012, intercarrier compensation for calls that originated in VoIP and terminated in TDM would be equal to the interstate rates applicable to non-VoIP traffic. Id. ¶ 933. These interstate rates may be tariffed through both federal and state tariffs. Id. ¶ 934. However, access charges in general will be phased out over the next several years and, by July 1, 2020, replaced with a "bill and keep" system whereby carriers will deliver and

16

terminate calls to and from another at no charge. *Id.* ¶ 801.  In adopting these reforms, the FCC was "mindful of the need for a measured transition for carriers that receive substantial revenues from intercarrier compensation." Id. ¶ 935. Such transition would not have been needed had VoIP-originated calls been exempt from access charges prior to this time.

CenturyLink properly provided Sprint with the switched access service which was detailed in the Federal Access Tariffs and properly charged Sprint the rate identified in the tariff.  Therefore, the Court finds that Sprint was obligated to pay the federal access charges due for VoIP-originated interstate calls delivered to CenturyLink for termination to its customers during the Dispute Period. To this extent, Judgment will be entered in favor of CenturyLink on Count I and against Sprint on Counts II and IV and the applicable portion of Count I.

### 2.  Whether State Access Charges Are Due

Generally, the Court's analysis on the federal access charges also applies to the state access charges.  CenturyLink properly provided Sprint with the switched access service which was detailed in the State Access Tariffs and filed with the public utilities commissions and charged Sprint the identified rate.

However, Sprint argues, in the alternative, that even if an IXC's delivery of VoIP-originated calls to a LEC for termination to end users is subject to access charges, then any state regulation of such traffic has been preempted by the FCC, and Sprint is liable at the federal access rates, rather than the higher state access rates.

In this case, more than one-third of the disputed charges—$3,106,087.32 of the total $8,755.402.46—concerns charges for intrastate traffic in Missouri.   Under Missouri law, VoIP-originated traffic is expressly subject to intrastate access charges. *See* MO. REV. STAT.

17

392.550(2) ("Interconnected voice over internet protocol service shall be subject to appropriate exchange access charges to the same extent that telecommunications services are subject to such charges.").

    If correct, Sprint's alternative argument would mean that Missouri state law—which unambiguously makes VoIP-originated traffic subject to state access charges—is preempted and therefore unenforceable, and Sprint need only pay CenturyLink the lower, interstate access rates, rather than the state tariff rates filed with the respective public utility commissions in each state where the CenturyLink LECs operate.

    "The burden of persuasion in preemption cases lies with the party seeking annulment of the state statute." *AT&T Corp. v. Pub. Util. Comm'n of Texas*, 373 F.3d 641, 645 (5th Cir. 2004). "Preemption is not lightly found." *Iberia Credit Bureau, Inc. v. Cingular Wireless*, 668 F. Supp. 2d 831, 837 (W.D. La. 2009).  A decision by a federal regulatory agency will be deemed to preempt state laws only if the agency "intend[ed]" to preempt the state laws in question.  *First Gibraltar Bank, FSB v. Morales*, 42 F.3d 895, 898 (5th Cir. 1995).

    Sprint cites the Court to dictum in the FCC's 2004 administrative ruling in *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the Minn. Pub. Util. Comm'n*, 19 FCC Rcd. 22,404 (2004).  In that decision, the FCC preempted certain Minnesota Public Utility Commission regulations that purported to apply to "nomadic" (or portable) VoIP calls. *See id.* (concurring Statement of Chairman Powell).  Given the inherently portable nature of nomadic VoIP technology, the FCC explained that it was simply impossible to track the jurisdictional confines (i.e., where the calls begin and end) of such nomadic VoIP calls. On the basis of that technological impossibility, the FCC found preemption of Minnesota's regulation of the nomadic VoIP service at

issue in that case. Id. ¶ 31.  In dicta in that decision, the FCC added that, beyond preempting state

regulations of nomadic VoIP, "to the extent other entities, such as cable companies, provide VoIP

services, we would preempt state regulation to an extent comparable to what we have done in this

Order." 19 FCC Rcd. at ¶ 32.

Sprint argues that, because the VoIP-originated traffic at issue here came from cable

companies and was otherwise comparable to the services the FCC described in this dictum, the FCC

therefore has preempted state regulations over the VoIP-originated calls at issue here. *Sprint's

Pretrial Mem.* (Rec. Doc. 165) at pp. 14-15.

However, CenturyLink argues that the cited *Vonage* decision is inapplicable, and the dictum

was later reversed.  It is undisputed that nomadic VoIP service is not at issue in this case.   Further,

soon after the 2004 *Vonage* decision, technology evolved to enable companies to track the

jurisdictional confines of "fixed" (or non-portable) VoIP-originated calls, such as the calls at issue

in this case. Based on this change in technology, the FCC expressly reversed its *Vonage* dictum just

two years later:

> [A]n interconnected VoIP provider with the capability to track the jurisdictional
> confines of customer calls would no longer qualify for the preemptive effects of our
> Vonage Order and would be subject to state regulation. This is because the central
> rationale justifying preemption set forth in the Vonage Order would no longer be
> applicable to such an interconnected VoIP provider.

*In the Matter of Universal Service Contribution Methodology*, Report and Order and NPRM, 21

FCC Rcd. 7518, ¶ 56 (2006).  This rejection was specifically acknowledged in an appeal of the

*Vonage* case to the Eighth Circuit Court of Appeals.  *See Minn. Public Util. Comm'n v. FCC*, 483

F.3d 570, 582-83 (8th Cir. 2007) (The [*Vonage*] order only suggests the FCC, if faced with the

precise issue, would preempt fixed VoIP service. Nonetheless, the order does not purport to actually

do so and until that day comes it is only a mere prediction. . . . Indeed, . . . the FCC has since

indicated VoIP providers who can track the geographic endpoints of their calls do not qualify for the

preemptive effects of the *Vonage* order).  Therefore, before the Dispute Period at issue in this case,

the FCC had already rejected the distinction on which Sprint relies in arguing preemption.

Sprint did not distinguish the FCC's reversal of the 2004 *Vonage* dictum in *In the Matter of*

*Universal Service Contribution Methodology*, the FCC's abandonment of the dictum in briefing

before the Eighth Circuit, or the Eighth Circuit's acceptance of the FCC's abandonment of the

dictum. [15]

Finally, CenturyLink points to the FCC's Comprehensive Reform Order itself that state

regulations of VoIP-originated traffic are not preempted. *See* Comprehensive Reform Order ¶ 934

("[W]e are not persuaded on this record that all VoIP-PSTN traffic must be subject exclusively to

federal regulation."); id. ¶ 959 ("[W]e do not rely on the contention that the Commission has legal

authority to adopt this regime because all VoIP-PSTN traffic should be treated as interstate.").

Instead, the Comprehensive Reform Order held that the "tariffing of charges for toll VoIP-PSTN

traffic can occur through both federal and state tariffs."

Sprint cited the Court to two district court cases, *PAETEC Communications, Inc. v.*

---

[15]Sprint provided the Court with supplemental authority in the form of a report and recommendation from a magistrate judge in a pending case in the District of Minnesota.  *See Charter Advanced Servs., et al. v. Beverly Jones Heydinger, et al.*, Case No. 15-cv-3935, April 21, 2016 Report and Recommendation.   However, the magistrate judge's analysis on a motion to dismiss has not been adopted by the district court.  Further, as the magistrate judge noted, the recommendation was only that the district court find it to be "plausible" that VoIP service is an information service and that state regulation should be preempted."  *Id.* at 44,  She further noted that "[t]he decisions reflected in the various case law and administrative authority submitted by both sides were made in the context of a full and complete factual record, and the same benefit should be afforded here."  *Id.*  In this case, the record is complete, and the Court has ruled accordingly.

*CommPartners LLC*, Civ. 08-0397, 2010 U.S. Dist. LEXIS 51926 (D.D.C. Feb. 18, 2010), and

*Southwestern Bell Tel. L.P. v. Missouri Public Service Commission*, 461 F. Supp. 2d 1055, 1079

(E.D.Mo. 2006), which support its position.  However, the FCC specifically disagreed with those

decisions which issued prior to the 2011 Comprehensive Reform Order.   Comprehensive Reform

Order ¶ 956 n. 1953 (noting that both PAETEC and Southwestern Bell "reached a different

conclusion than our statutory analysis . . . . [W]e are not bound by those prior decisions, and find our

statutory analysis above to be most appropriate.").

        "A court's prior judicial construction of a statute trumps an agency construction otherwise

entitled to Chevron deference only if the prior court decision holds that its construction follows from

the unambiguous terms of the statute and thus leaves no room for agency discretion." *National Cable*

*& Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).   However, as

CenturyLink pointed out, both the prior decisions were based on the courts' educated guesses about

how the FCC might regulate VoIP if given the opportunity.  *See Southwestern Bell*, 461 F. Supp. 2d

at 1081 (while "the FCC has not yet ruled on whether IPPSTN is [an information] service, the orders

it has issued lead to the conclusion that" it is); *PAETEC*, 2010 U.S. Dist. LEXIS 51926, at *7 n.3 ("If

the service evolves, the Commission could revisit its decision in [a previous FCC] order. It

could—but it hasn't." (quotation omitted)).

        The Court finds that the state access tariff rates are not preempted.  The FCC has spoken on

this issue, its decision is entitled to deference, and the Court finds that decision to be consistent with

the statute.  Applying the express law in Minnesota and the filed rate doctrine, Sprint was required

to pay the state access tariff rates for VoIP calls during the Dispute Period.  To this extent, the Court

will enter judgment in favor of CenturyLink on Count IV and against Sprint on Count III and  the

21

applicable portion of Count I.

### C.    Section 201 of the Communications Act

CenturyLink's Count III alleges that Sprint engaged in an unjust and unreasonable telecommunications practice in violation of 47 U.S.C. § 201(b) when Sprint undertook self-help by withholding payments to CenturyLink for tariffed services about which Sprint had raised no dispute.

In relevant part, 47 U.S.C. § 201(b) provides that any "practice" in connection with providing a communications services "that is unjust or unreasonable is hereby declared to be unlawful." 47 U.S.C. § 201(b).  To be liable for a violation of 47 U.S.C. § 201(b), a carrier must either violate the Communications Act or engage in an action the FCC has deemed to be an "unjust and unreasonable practice." *Global Crossing Telecomms., Inc. v. Metrophones Telecomms.*, Inc., 550 U.S. 45, 53-54 (2007); ECF 36, Ruling, at 2 (Jan. 25, 2011) ("the FCC has not issued an order that establishes a statutory violation").

As the Supreme Court has recognized, "persons injured by §201(b) violations" have a private right of action under 47 U.S.C. § 207 "to bring federal-court damages actions." *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45, 53 (2007). Moreover, "[i]nsofar as the statute's language is concerned, to violate a regulation that lawfully implements § 201(b)'s requirements is to violate the statute." *Id.* at 54 (emphasis in original).

The FCC has recognized that self-help is an unlawful telecommunications practice. *See, e.g., In the Matter of Business WATS, Inc.*, 7 FCC Rcd. 7942 (1992) ("[A] customer . . . is not entitled to the self-help measure of withholding payment for tariffed services duly performed but should first pay, under protest, the amount allegedly due and then seek redress . . . ."); *In the Matter of MCI Telecommunications Corp.*, 62 FCC 2dFCC 2d 703, 706 (1976) ("We cannot condone MCI's refusal

to pay the tariffed rate for voluntarily ordered services. . . . [S]elf-help is not an acceptable remedy . . . .").

The Court has found that CenturyLink properly billed Sprint for VoIP calls between August 2007-July 2009.  Therefore, Sprint unjustly and unreasonably withheld payments due to CenturyLink to reduce its retroactive refund claim.  By doing so, Sprint violated § 201(b).  Judgment is entered in favor of CenturyLink and against Sprint on Count III.  CenturyLink may not recover double damages, but may recover reasonable attorneys' fees under 47 U.S.C. § 206 and prejudgment interest.

### C.     Sprint's Count II--VoIP Calls – Unlawful Imposition of Charges for Interstate Services, 47 U.S.C. §§ 201(b), 203

In Count II, Sprint alleges that CenturyLink committed an unjust and unreasonable telecommunications practice in violation of 47 U.S.C. §§ 201(b) and 203 when it collected access charges that were allegedly not authorized by the terms of CenturyLink's Federal Access Tariffs. Given the Court's Findings of Fact and Conclusions of Law, judgment on this claim will be entered against Sprint and in favor of CenturyLink.

### D.     Sprint's Count IV (Recoupment)

Sprint asserts this alternative claim in the event that the Court determines Sprint's entitlement to a recoupment more properly designated as a counterclaim.  Sprint contends that CenturyLink's claims must be reduced, in full or in part, by the amounts that CenturyLink overbilled Sprint for VoIP Calls, under the tariffs described in the Complaint, between mid-2007 and mid-2009.

Given the Court's Findings of Fact and Conclusions of Law, judgment on this claim will be entered against Sprint and in favor of CenturyLink.

### III.    CONCLUSION

For the foregoing reasons, the Court finds that Judgment should be rendered in favor of CenturyLink on Counts I, III, and IV of CenturyLink's Complaint and against Sprint on Counts I, II, III, and IV of Sprint's Counterclaims.  Judgment is further rendered in favor of CenturyLink and against Sprint in the amount of $8,755,402.46 for access charges, late payment fees of $3,805,343.00 as of February 2, 2016, and additional late payment fees accrued since that date.

CenturyLink is also awarded attorneys' fees, costs, and prejudgment interest.  CenturyLink shall make appropriate filings within fourteen (14) days of the date of this Judgment in support of attorneys' fees, costs, and prejudgment interest.  Sprint shall have fourteen (14) days from the date of CenturyLink's filings to file an opposition memorandum.

MONROE, LOUISIANA, this 4th day of May, 2016.


**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**

24